The Assistant Vice-Chancellor.
When the mortgage to the Washington Insurance Company was assigned to the Life and Fire Insurance Company, in October, 1823, it was indisputably a valid lien, and the first lien,, on the Dutchess Cotton Factory, and the lands appendant to it. This mortgage has never been intentionally paid off or in any way discharged,, and the trustees of Mrs. Dyett’s marriage settlement claim that it belongs to the trust estate ; while the defendants insist that it *336 has either been actually paid, or has lodged, in a position where it never can be enforced, or that the right to enforce it passed to Bache upon the master’s sale in 1830, and is now vested in them.
The mortgage was transferred to the Life and Fire Company, as security for a loan and advance made by that company to the trust estate. Chapman applied for the loan as one of the trustees, and as the agent of that estate. The object was to present a sacrifice of the trust property under the decree obtained on the mortgage; and the loan was made upon the security of Chapman’s note, and of the assignment of the mortgage and decree, which at the agent’s instance, was executed by the Washington Insurance Company to the Life and Fire Company. The former received their debt, but there was no intention in any quarter to discharge the mortgage. On the contrary, all concurred to keep it on foot. It was the security on which the Life and Fire Company made their advance, and with the assent of all, it was assigned directly to them for that purpose. There was no merger, nor any payment or satisfaction" of the mortgage.
The contract of loan was clearly usurious, and the transaction as to taking the note by the Life and Fire Company was illegal, as was also the issue of the notes or bonds of that Company, in which the advance was made to the trust estate.
But the mortgage and decree remained valid. They were neither extinguished nor merged; and were totally unaffected by the usury and illegality of the contract upon which they were assigned.
What then was the situation of the parties, in reference to these securities? Were they so utterly beyond recovery in the hands of the Life and Fire Company, that they could not be affirmed or made good by the borrowers ?
I am satisfied that they were not.
Suppose that in 1824, the trust estate, not choosing to plead usury, or to repudiate the loan, had applied to the North River Insurance Company for an advance sufficient to redeem the mortgage and decree, upon the security of a transfer; and a loan had been made accordingly, upon which the Life and Fire *337 Company had received their principal and interest, and had then assigned the mortgage, and decree to the North River Insurance Company; there is no doubt that the title of the latter would have been perfectly good, nor that the Life and Fire Company could have retained their whole principal originally advanced, whether in money or bonds, and the legal interest on the amount.
This usurious and illegal contract, was therefore capable of affirmance by the trust estate, as the borrowers from the Life and Fire Company. This right of affirmance, and to redeem the security pledged, was not an interest in the land mortgaged. It was wholly distinct from the land, and was the same precisely as if, when the loan was made, the trust estate had been the mortgagees and the lands had been owned by Stephens or a stranger. The application of the money loaned to the exoneration of the land, does not make the borrower’s right to redeem the security pledged for the loan, an incident to the land.
But it is said that Bache and those claiming under him, may object to the legality of the assignment to the Life and Fire Company, independent of their having succeeded to the rights of the trust estate, which is another point.
As purchasers of the estate incumbered by the mortgage, (and it is not claimed in their behalf as strangers,) they have no right to object to the transfer of the mortgage, or the title of the Life and Fire Company, on the ground of the usury. This would have been the same, if the Life and Fire Company were attempting to enforce the decree. Such is the law, as established by the court for the correction of errors, in respect of privies in estate, in the case of Post v. The Bank of Utica, December, 1844,(a) reversing the decision of the chancellor which was made on the same grounds as were stated by him in Cole v. Savage, 10 Paige, 583.
And as purchasers subject to the Washington Insurance Company mortgage, which I will presently advert to more at large, they are precluded from setting up its invalidity on any ground, in the hands of its owners or their assignees.
*338 Another objection to Bache and the defendants attacking the assignment is, that the trust estate, and the trustees representing it, having a right to redeem the security, have obtained it, and it is valid in their hands. It was never invalid in itself, and their affirmance of the transfer to the Life and Fire, and virtually redeeming it, has purged it of all the sins through which that company were vested with it.
II. Next it is insisted by the defendants, that if the assignments were valid, the mortgage and decree cannot be enforced against the mortgaged premises, for several reasons.
. 1. Because it is said, Bache acquired the whole interest of the trust estate, by his purchase in April, 1830, under the decretal orders made in Chapman’s suit against Hamersley and the Dyett’s, and by their conveyance to him in conjunction with the master who made the sale; and that there was no right left in the trust estate, to affirm or set up any claim under the mortgage or decree.
■ Considering all the circumstances of this case, (I have not time to enumerate them;) this is an extraordinary proposition. Chapman’s bill proceeded on the assumption that this mortgage was outstanding, and a valid lien. He did not seek to displace or affect it. On the contrary, the bill prayed for a sale subject to three mortgages, of which, confessedly, this is one. The orders for sale made in 1829, directing a sale of all the estate, interest and demand of the parties in, to and upon the property, are to be construed in reference to the bill. But if the decree were to be regarded, irrespective of the bill, the sale itself, and the deed of the master, cannot be overlooked. Chapman’s solicitor made a special application to the master to sell subject to all the incumbrances and liens. The master put up the property in that form, and a list of the liens, including not only this mortgage, but the Stephens mortgage of $6000, hereafter mentioned, the Evertson and Givan mortgage of $11,000, and others, was publicly exhibited and declared at the sale. And the master-struck off the property, subject to all liens and incumbrances thereon.
The deed of the master, in which the parties joined, declares that the premises were struck off to Bache for $120, “ over and *339 above all incumbrances and liens thereon.” This shows either that he was to have a clear title, or that he bought subject to all the liens and incumbrances outstanding. Not subject to them, in the sense that he thereby assumed and became personally liable to pay them ; but that he took the title, subject to the lien and charge of such incumbrances. The idea of Bache’s purchasing for $120, when the litigation in Chapman v. Hamersley> was at its most fervent stage, a cotton manufactory in full operation, free from incumbrances, which seven years before was sold to those parties for $60,000; is too monstrous to be listened to for a moment. And I can perceive no alternative between that proposition, and the one that he bought subject to all the outstanding incumbrances. And by the combined action of the parties to those orders, the master executing them, and the purchaser himself, the latter appears to be in the situation of one buying expressly subject to a usurious mortgage, who cannot after-wards question its validity. (Shufelt v. Shufelt, 9 Paige, 137.)
Now as to Bache’s having acquired the right of the trust estate to obtain and set up the Washington Insurance Company’s mortgage and decree. The execution of the deed by the parties with the master, conveyed no other or greater interests than were expressed in the orders of sale. It was done in pursuance of the orders, and for the sole purpose of giving to them full and entire effect. No person bidding at the sale, could reasonably suppose, that he was buying any interest or right which was not vested in the parties when the orders were entered ; and no other interest could be affected by the master’s sale.
The utmost latitude that could be given to the effect of a deed, executed as this was under an order, would be to pass interests which were acquired prior to its date; and it is clear that the interest which the trust estate asserts in this suit, was not acquired till after the sale.
There was a negotiation in respect of that interest, after the orders were made and prior to the sale, and the terms were mainly agreed upon, but they were not fully ratified ; nor was there any instrument executed, by which any of the parties were bound, until after the sale and after the date of the deed, and its actual execution by most of the parties.
*340 If therefore the right in question were to be deemed an interest or demand in or upon the premises, it dates after the sale to Bache.
But in my judgment, as I have before stated, the affirmance of the assignment of the mortgage and the right to reclaim the security itself, were attached to the trust estate, as a borrower from the Life and Fire Company, and not as the owner of the Dutchess cotton factory.
Entertaining these views, it is needless for me to examine here, another grave difficulty which is said to be in the way of Bache’s position, that by the purchase at the master’s sale he acquired the whole interest of the trust estate in the property. The chief interest in the trust estate was at that time vested in the children of Mrs. Dyett, and it is argued with great force, that those children were indispensable parties to a proceeding, by which one of their trustees sought to charge upon the trust estate, such a load of debt; the debt growing out of acts in which he was the prime mover, and which if not of questionable validity, were certainly improvident. And further, that the deed itself, and the prior proceedings, were totally defective to impair or charge the reversionary trust estate, because there was but one subscribing witness; when by the express terms of the marriage settlement, two witnesses were required to an instrument approving the disposition or alienation intended. That this objection is the more cogent, because the whole scope of the suit, was only the life estate of Mrs. Dyett and her husband. These points present very serious and important questions, which it is not necessary for me to determine.
Passing this by, I come to the next objection of the defendants, viz. that it is inequitable for the trust estate to attempt to disturb Bache’s title derived under the sale in April, 1830, upon the faith of the orders of the court.
I do not perceive any thing inequitable in this particular. Aside from the express notice at the sale, Bache was bound to know what title he was obtaining, before he received t,he deed; and if he had investigated the matter, he would have seen that he was buying subject to the Washington Insurance mortgage and decree. Under the circumstances, it would be 'far *341 more inequitable to permit him, after buying the property for a nominal bid, subject to this mortgage, to avoid it in the hands of a holder in good faith. There was nothing covert in the transaction of the trustees in procuring the mortgage, or unfair towards the proceedings in Chapman’s suit. Any party to a foreclosure, may after a decree of sale, buy a prior lien which is unaffected by the decree, and the subsequent sale will not impair his rights in respect of such lien.
Akin to this, is the point that at all events, Bache succeeded to Chapman’s right and interest as equitable tenant in common of one moiety of the property, and it was inequitable for the trust estate to acquire an outstanding claim or title against the common property, in order to defeat the title of its co-tenant; and the court will not aid such attempt, especially it will not, without first adjusting all the equities between the parties ; and then will not suffer the outstanding claim to be enforced, beyond the balance due, or beyond the right and interest of the tenant in common acquiring such claim.
The case of Van Horne v. Fonda, 5 J. C. R. 388, 407, was cited in support of this objection. The dictum of the learned chancellor in the case, applies only to a continuing community of interest in the subject matter, or in the property affected by the outstanding claim, where both tenants in common are in possession under an imperfect title jointly acquired. The principle does not apply to the facts before me, because the parties had become emphatically antagonistic to each other in their claims and interests, and a sale of the whole joint interests had been ordered, before the negotiation for the purchase of the claim commenced; and before the purchase was completed, Bache, a stranger to both parties, had become the owner of all the interests of both in the real estate affected by the lien. There was thus, no duty or obligation whatever, remaining on the part of the trust estate towards Bache, at the time of the purchase of the mortgage and decree. It may, perhaps, be contended, that Chapman is to be deemed a joint and equal borrower with the trust estate, from the Life and Fire Insurance Company, and thus equally entitled to affirm the contract, or to insist on its avoidance, and that Bache succeeded to his right in that behalf. *342 There are several answers to this, if it should be urged. First, if Chapman were so entitled, it was a personal right, and not one running with, or attached to, the title to the property. It therefore did not pass to Bache by the master’s sale. Secondly, Chapman has taken care throughout, to hold forth the trust estate as the borrower, and the sole borrower, from the Life and Fire Company. He charged against the trust estate in his accounts, all the sums paid towards the loan, and all the losses incurred by it. And finally, the defendants contended at the hearing, that the trust estate, as between itself and Chapman, was bound to discharge this mortgage and decree. Therefore, in no point of view, can Chapman be regarded as a borrower, having an equal right with the trust estate, to affirm or to avoid the illegal loan.
This appears to be a sufficient answer to the objection founded upon the community of interest. But I choose to pursue the inquiry farther in that direction, because I think it will elucidate some of the remaining points of the case.
Chapman, after contracting with Stephens in his own name for the factory, including the Reid property, arranged with himself and Hamersley as trustees of the separate estate of Mrs. Dyett, to become the joint owners of the whole property. Considering his situation as trustee, the mode in which this was carried out, was quite extraordinary. The premises were conveyed by Stephens to the trustees, subject to mortgages to the amount of $40,500. One of these, was Stephens’ mortgage to the trustees themselves, for $9000, executed a year before; in order to furnish which sum to Stephens, thereby accommodating Chapman, the trustees had, in 1822, mortgaged the trust property, consisting of the house and lot 194 Broadway. The mortgage of Stephens for $9000, was cancelled by the purchase ; but the one given by the trustees remained. For the balance of the price, the trustees gave a mortgage of $15,000 to Stephens on 194 Broadway, and the parties assumed and paid, from the proceeds of the factory, $4000 of Stephens’ notes then outstanding. Thus, leaving the notes out of view for this purpose, the trust estate was made to pay the whole consideration which .was paid to Stephens, by means of mortgaging, to the amount *343 of $24,000, the valuable lot in Broadway which Mrs. Dyett had by inheritance, and which was vested in the trustees in order to preserve it for her and her children.
After subjecting the trust property, directly and indirectly, to the whole perils of the purchase ; Chapman agreed with himself and Hamersleyas trustees, to become the owner of an undivided half part, and to conduct the business of manufacturing on joint account. The agreement executed on that occasion, provided for the payment by Chapman individually, of the two mortgages of $9000 and $15,000, placed upon the Broadway lot; and it was thereby declared, that Mrs. Dyett had consented to the whole scheme, on the express condition, that Chapman should keep her and her heirs and representatives, and the trust estate, harmless and completely indemnified from and against those mortgages, and from and against any loss or damage to arise or accrue to the trust estate, by reason of the purchase of the factory. This was the positive agreement, and it was the least that equity would have required of a trustee, thus speculating for his own benefit, upon the credit acquired by mortgaging the trust estate. And the trustee, having not only failed to pay the two mortgages, but having signally failed to save the estate harmless from them; and having in truth, involved the trust fund in endless perplexities and grievous losses, by means of thm* unwarrantable adventure in which he enlisted it; can expect no less than that equity will hold him to the terms of his contract, and not suffer him now to escape the forfeiture of its benefits which he has incurred, in order to enable him to detract from the little pittance which the subsequent trustees have succeeded in saving from the wreck of Mrs. Dyett’s separate estate.
I speak of the transaction as I cannot help regarding it, notwithstanding the prominence which Chapman gives to Dyett in all these affairs. No man can fail to see, looking at this whole history, that Chapman throughout, was acting zealously for his own interests. Where those were coincident with the interest of the trust, he was equally zealous for the latter; but where they conflicted, and it was unavoidable that they should, sometimes conflict, no one can doubt whose interests would *344 suffer, Chapman himself controlling both. If it were true, that Dyett’s importunities led him into the purchase for the trust and the subsequent mishaps, I can only answer, that he should have resisted them with firmness, even to the point of being removed from the trust. They cannot excuse him to the beneficiaries of the trust, who have suffered by his conduct; whether it was the consequence of weakness or cupidity.
But, to proceed another step in Chapman’s favor, if there should be no forfeiture of his claim to be regarded as a purchaser of one half of the property; there is no doubt of the right of the trust estate to acquire this mortgage and decree, for its own protection against the losses to which it has been subjected in its capital, by means of the purchase of the cotton factory. And it will be time enough for Chapman, or for Bache, if the latter now have his rights, to repudiate and avoid the Life and Fire loan, and the half part of the mortgage and decree pledged thereupon, when he has complied with the terms of his contract with the trustees on the purchase of the factory.
As it is perfectly obvious, that it will require more money to fulfil and make good those terms, than the amount of half of the mortgage and decree; it is useless to consider the point farther.
wv-Nor would this result be changed, if the sum paid by Bache for the machinery, in consequence of the foreclosure of the Evertson and Givan mortgage, were thrown into the scale, in favor of Chapman and Bache. And the same may be said of the Henderson mortgage.
I say this without expressing an opinion as to the propriety of charging upon the trust estate exclusively, the payment of those mortgages. I am aware that Chapman insists, the trust estate was bound to pay the whole of the Washington Insurance mortgage and decree, and it is said the estate so agreed with Stephens. As to this, in the first instance Chapman made such an agreement with Stephens. Then in the deed executed by Stephens, the trustees agreed to pay up the mortgage. But neither of these agreements affect the question, which is this; who, as between Chapman and the trust estate, was to pay the mortgage, on their becoming joint owners of the property? I *345 find no answer to this question in the proofs. An inference may be drawn, that the estate was to pay a part of it, from Chapman’s stipulation to pay the mortgages on lot 194 Broadway. But a more probable inference from the proofs, is that there was no express agreement on the subject; it being supposed that the mortgages would all be paid, in time, out of the profits of the factory.
I should have noticed before, an argument that the $15,000 mortgage, on lot 194 Broadway, was invalid against the trust estate, and therefore its payment, in whole or in part, was a voluntary act, with the consequences of which the defendants are not to be charged. To this 1 need only say, that it Would be a bold proposition, in the mouth of Chapman, who executed it; and as to Bache and the other defendants, equally so, if they claim Chapman’s right to repudiate it. As strangers to it, they have nothing to say in the matter. Therefore, I need not inquire how far the trustees, after keeping and consuming the property, for the purchase money of which it was given, could be permitted to avoid the mortgage for defects in its execution ; still less is it necessary to examine the grave and momentous questions arising upon such alleged defects.
As to the validity of that mortgage, after it went into the Life and Fire Company, what I have said already, shows that Ste-, phens could affirm the company’s title to it, and make i,ts transfer to a stranger, valid.
It remains for me to examine, in connection with this head of the cause, the set offs claimed in favor of the defendants.
First. The payments made by Chapman to the Life and Fire Company, were charged to the trust estate in the factory accounts, and are not to be deemed applicable to his contract of purchase of the one-half of the property, in any greater degree than those accounts in general. Then, in regard to such an application of any of those accounts; it is clearly inadmissible. His contract was to discharge the $24,000 of mortgages, which as trustee, he had placed on the capital or corpus of the trust fund. His performance, in this view of it, consisted in running up a huge account; which, so far as there was any benefit from it, enured to the benefit exclusively of the life tenants of the in *346 come, Mrs. Dyett and her husband, (almost wholly to the latter ;) while the mortgages on 194 Broadway, were left to eat out all that was valuable of the trust capital. The statement of the facts is sufficient, without dwelling upon their force.
Regarded as a set off to the Washington Insurance mortgage and decree, how does the matter stand? These securities are, beyond doubt, to be deemed, a part of the capital, the body, of the trust estate. As such, they are in no wise liable for any debts or charges of Mrs. Dyett, or of Joshua Dyett in his life time. Now, the set-offs set up, consist exclusively of such debts and charges. The whole factory concern, out of which they grew, was carried on, not to enlarge the trust capital for the benefit of the beneficiaries in remainder, but to swell the income, for the immediate benefit of those entitled to the current rents and profits. There is no pretence that the debt to Chapman, or that to the Prali’s, was contracted by the trustees, for the benefit of the estate in remainder. (See North American Coal Company v. Dyett, 7 Paige, 9.) And as to the balance to Chapman, if such pretence had been made, and it were made out that a benefit to the capital was intended, I do not perceive hovv equity could sanction the claims in his favor; he being the trustee, and it appearing that no benefit ensued.
Indeed, from the decision cited, it maybe doubted whether the balance due to Chapman, prior to 1827, could, after that time, be charged upon the income of the trust property. However, the right to charge it upon the income was not contested by the complainants; and to the extent of the value of Mrs. Dyett’s net income for her life, the account of Chapman and the Prall debt, in the hands of Bache as assignee, may be deemed a valid set off against the mortgage and decree. There must also be deducted, the balance paid by Chapman to the Life and Fire Company, and to the Washington Insurance Company, over and above what was released by the Life and Fire loan. The value of the life interest in the income, may be ascertained on the principle of life annuities; and as Chapman’s account confessedly exceeds the value, no reference as to that account is required. The crediting in favor of the estate, of the $5000 paid to Chapman by Dyett, out of the factory, on Dyett’s *347 attempt to purchase his interest, in 1825, which sum. is justly chargeable to Chapman, would not affect this result.
The set-off of the Life and Fire bonds, cannot be allowed for even the sum paid, as they were void; and they are not connected with this transaction in such a way as to give Bache any equitable claim.
The bond and mortgage for $6000, by Chapman to Stephens, dated March 12th, 1824, are void for usury as against Chapman. He was to pay interest quarterly on that sum, and Stephens took an agreement from Chapman, in the name of Jones and Buck, for the payment of $800 more, each year, in quarterly payments, in respect of his whole advance of $11,288 34, which included the $6000.
But Bache, the purchaser of Chapman’s title, at a sale under a decree, has no right, according to the decision in Post v. The Bank of Utica, before cited, to object to the legality of this mortgage on the ground of usury. As to the further objection, growing out of the unlawful transactions by which the Life and Fire Company acquired the $6000 mortgage from Stephens, the case stands in this position: If the assignment transmitted any title to the Life and Fire Company, such title became vested in Mr, Wells, by the indenture of May 3d, 1830. If the Life and Fire Company acquired no right or title, then Stephens continued to be the owner of the bond and mortgage, and it passed, in that event, to the trust estate, in September, 1830, by the assignment set up in the answer.
Thus, in either view of the matter, the trust estate became entitled to the bond and mortgage, and the foreclosure thereon cut off all Chapman’s interest as purchaser under the agreement in 1823, which passed to Bache by the master’s sale.
This result has been rendered comparatively unimportant, by my previous conclusions in respect of the interest which Bache acquired at that sale.
This mortgage debt is also urged as a claim against Chapman’s account, to the extent of the $6000 and interest, under the assignment in September, 1830, even if the bond and mortgage were invalid; because there was a precedent debt untainted by usury, which was transferred by that assignment, *348 In this view, there could be no set off, for the reason, that before the trust estate acquired the debt, Chapman had assigned his claim against the trust estate, to Taiman.
On the other hand, there is no good reason for holding, that the trust estate, in any mode in which they may make the bond, mortgage or debt of $6000, available ; should be restricted to the sum which was paid for its transfer.
As to the binding force of the order of December 23d, 1831; 1 am not aware that any advantage can be derived to the defendant’s, by adhering to the terms of that order, which has not been given to them in this suit. If there be any other, I will hear the parties on the subject, when they appear to settle the draft of the decree. The Moulthrop lot, which is excepted in that order, will of course be excepted now; it being conceded, that it was never subject to the Washington Insurance Company mortgage.
As to the Reid factory and lot; on the one side, it is claimed that when Stephens became the owner of those and of the Slee Factory also, the grant of the use of the water executed by Slee to Reid, became merged in the estate out of which the grant issued ; and if that were not the result, then the grant itself is forfeited, by the perversion of the water to the use of a cotton mill, instead of a paper mill to which it was restricted. On the other side, it is contended that there has been no substantial change made in the use of the water power; and if there have been, it was effected by Stephens, under whom the complainants claim, and who was in effect Bache’s grantor, and the complainants cannot be permitted to raise the question, All these propositions, except that as to a forfeiture, are susceptible of a brief and common answer. The complainants now represent the Washington Insurance Company, whose title by mortgage, was paramount to Stephens, and vested them with the right to insist on the restricted use of the water, while it subjected them to permit its use for a paper mill by those deriving title from Reid prior to their mortgage. The defendants represent the latter right, as well as Stephens’ title to the Slee factory; while the complainants, in 1830, were deprived of all their estate derived from Stephens, Now, in 1822, when Stephens owned *349 both factories, though there might have been a merger as to him and his equity of redemption in both, there was none as to the mortgagees respectively. The Henderson mortgage held the water power granted for the use of the paper mill, and the Washington Insurance mortgage in like manner held the right to restrict its use to that object.
The complainants as assignees of that mortgage have the same right now.
I do not think that the perversion of the water, effected a forfeiture of the whole privilege. There is nothing in the grant to require so strict a construction, and the circumstance of the change being made by one who owned both establishments, would make the application of a forfeiture, very harsh and severe, if one were required by the contract.
But the complainants have a clear right to restrict the use of the water to the terms of the grant; and they may have a perpetual injunction, restraining the defendants and those claiming the Reid lot under them, from applying the water to any hydraulic purpose other than the use of a paper mill.
They are also entitled to a reference, to ascertain the boundaries of these properties respectively, in order that the purchaser of the Slee factory and premises under the decree, may know their extent, and be quieted in his possession.(a)
As it is made a distinct point, I ought to notice more at large, the argument that the trust estate should not be permitted to enforce the Washington Insurance decree, for any more than its cost to the estate.
There is no good ground for this, in my judgment. The trustees, when they purchased the decree, (as I have before had occasion to observe,) stood in no relation of trust or confidence, or duty, to Bache or those whom he represents. They had the same right to buy it, that any stranger had; and the same right to make all they could out of the property which it incumbered.
In consequence of Mrs. Dyett’s life interest in the mortgage and decree being absorbed by the set-off of Chapman’s debt, the whole amount recovered under the decree in this suit, will be *350 long to the capital of the trust fund, and to her children, excluding her from its benefit.
The complainants are entitled to a decree on these principles, for a sale of the mortgaged premises, after ascertaining the boundaries, and the amount due for principal and interest upon the former decree. They will receive such amount, with the costs of the suit, out of the proceeds of the sale.

 Now reported in 7 Hill, 391.

 See note on next page.
*350 (a) The portion of the decree for settling the boundaries of the respective factory lots, was as follows:
“ And it is further ordered and decreed, that such master do ascertain the true and definite boundaries, of the premises and parcels of the lands mentioned in the pleadings as conveyed by Samuel Slee to George Reid, and to distinguish and set out the same by proper metes and bounds, and whether the building and factory known as the Reid factory, and built and erected by the said George Reid, is wholly within the parcel of land conveyed by the said Samuel Slee to the said George Reid, as mentioned in the pleadings ; and whether some, and what part thereof, or of the wheels or erections connected therewith, are not beyond and without such boundaries, and where and upon what parcel of land or premises any part of such factory, building, wheels or erections are or stand. And for such purpose, the parties respectively are to deliver to such master, all deeds, instruments, surveys or plans, in their possession or under their control, and the defendants, or such of them as are in possession of the said premises, are to grant and allow, free and reasonable access, to and upon such premises, from time to time, as may be required, to the complainants, their solicitors, surveyors or agents, for the purpose of inspecting, surveying and examining into the premises. And that such master be authorized to employ a suitable surveyor for such purpose, and to cause to be made all proper maps and plans of the premises. And he may make a separate report thereupon if required by either of the parties in the cause who have appeared and answered.”